Good morning, Your Honors. Donald Cook for the appellants. Javier Bravo, Sr., his wife, Hope Bravo, and their 8-year-old granddaughter, Evie. Lieutenant Mitchell recorded the first minute of the break-in. Is this in the record? Yes. Were we given notice you were going to do this? We filed, it was in the record before the trial court. Were we, that's the three of us, given notice you were going to do this? Well, I filed a notice. The answer to that is either yes or no. I don't know what you mean by notice. We filed a notice. Did you tell this panel that you were going to play this recording during your argument? No. I leave it to my colleagues. Without that permission, I'm not interested in listening. I don't need to hear it. I'm sure it's a horrible thing to have your house broken into in the middle of the night and everyone's very upset. I assume that's what you're going to play to make that point on us. I'm not sure what that has to do with the legal issues we're facing. It has to do with the legal issue about the quality, the nature and quality of the intrusion here. Now, we made a motion over a year ago to make this recording part of the record. At that time, the clerk issued an order stating that our motion would be referred to the merits panel for the disposition of making this recording, which was before the district judge and which the district judge relied upon, to make it part of the record before this court. Now, to date, there's been no ruling on the motion. I would expect at some point the panel would make a ruling on that motion. That's an entirely different issue than your use of a demonstrative exhibit. I'm the same position that Judge Kogan is in. We understand this was a disruptive event, but there's a difference between asking for something to be part of the record and asking for permission to use a demonstrative exhibit during an appellate argument. I would think we should not spend too much time on this. I would agree. You've got limited time for the main argument. I'd suggest proceeding with that. Yes. Just a correction. It's not just demonstrative evidence. It's the actual evidence of what happened. In any event, what we have here is what's called a dynamic entry by a SWAT team, dressed in black, nighttime execution of a search warrant, as Judge Florence Marie Cooper spelled out in her order. Counsel, I'm not being flip with you. I'm assuming it was a horrendous event, okay? I mean, their house broken into in the early morning at 5.30 a.m. by a SWAT team. It's traumatic. I accept that. Can we go on with the case? Then from that fact, the law is you have to look at the degree of intrusion, which was high here. What did they do to minimize the risk of what happened here? What type of care did the police exercise? The justification for conducting this search, this SWAT search, which as you've acknowledged was a highly intrusive search, a dangerous search, the justification was it's Javier, Jr. He lives there. He's this shot caller with the gang. Putting aside for a moment the unreliability of that information, that was the basis. And then, of course, we know from the criminal history sheet, rap sheet, that Tenori had where he makes a point of referring to and he was convicted of receiving stolen property. Right below it, it has sentenced to two years state prison, some seven months before our April 21, 2006 incident where the shooting occurred. So it's not the first issue whether Tenori merely made a mistake, which is not actionable, or whether he did it deliberately or recklessly, which is close to deliberately, and is therefore liable? I would say that Your Honor has misframed the question.  Well, I'm asking you if it is. Is that the issue, whether it is? No. Whether you want to call it a mistake or indifference, you go to Liston v. County of Riverside. That was the failure of the officer to tell the magistrate that, by the way, there's a for sale sign there. And this court held that that fact made the warrant invalid because that would be a material fact for the magistrate's decision issuing the affidavit. Now, what we have here is something at least as egregious, if not more so. The fact that some, as I say, seven months before he's been sentenced to state prison, and the justification for this highly intrusive, dangerous search is the presence of Javier, Jr. Let me ask a question, if I can. I know that in the warrant application process, the officers informed the issuing magistrate that they wanted to execute this warrant at night. And they spelled out why they thought that was necessary. Am I right so far? That is correct. Did they at any point in their application process or the magistrate authorize or describe the tactics to be used, specifically SWAT team, et cetera? No. The magistrate did not. In other words, that was not part of what the officers put in front of the magistrate, and it's no part of what he authorized. Correct. This was a decision by the police to use, again, this highly intrusive, dangerous method of entry. I think you know what my follow-up question is going to be. What does the presence or non-presence of Javier, Jr. have to do with why we're here? Because hopefully you'll grant the motion, you'll appreciate how intrusive and dangerous this nighttime search was. I'm either not being clear or you're being evasive. All right. I don't want to be evasive. We've now established that no part of what the officers put in front of the magistrate was designed to get a warrant which authorized the tactics actually used, correct? Correct. So the missing element, you argue, is that they should have known that Javier, Jr. was not there, could not be there. What does that have to do with the tactics that were used? The search wouldn't have occurred. The reason to go to the Javier residence is because of Javier, Jr.'s participation. But your argument is, and correct me if I'm wrong, your argument is that his presence in the home was absolutely material to the execution of the warrant. It was absolutely material to its procurement and execution. All right. Now, Tom. Can I ask you one question? Sure. Is my understanding of the record correct that Tenore, if I'm pronouncing it correctly, actually did affidavits for seven warrants that night, of which this was one, and some of those were no-naps and some were nap, right? Correct. Doesn't that, again, tend to suggest that with regard to this one warrant, all he did was overlook the line? It was not, you know, he's putting all these things together. He's got seven of them. On some, he's careful enough to say, we don't need no-nap for this. And on this one, he blew it. The question is, I would say, the justification for including the Bravos residence in with the other residence is subjected to this search. It was one warrant application for a basically search warrant for seven different homes. And the justification, of course, goes back to Javier, Jr. to say that, well, gee, he made a pretty good effort with the other six, and this is just maybe kind of like a slip-up. I would submit that you need probable cause to search a home, whether it's part one of seven or if it's a warrant just for a single home, that you're still held to the same standard of care for each home, again, whether it's one of a group or if it's a house by itself. So your view is that if there had been a disclosure that he was not in the home, that he was still in custody, the warrant would not have been issued, even though he was an acknowledged gang member, and as a gang member, his family might have had some of the materials? First, a correction, a statement of fact. He was not an acknowledged or self-admitted gang member. That was true for the other six individuals mentioned. The only information about Javier, Jr.'s gang membership came from the unidentified informant. And there was substantial evidence that, in fact, Santa Maria Tenori knew or should have known that he wasn't a gang member because previous records with Santa Maria indicated he wasn't a gang member. So, I mean, that admittedly is disputed, which is one of the reasons why the Santa Maria motion shouldn't have been granted. But, again, given that the only information was from the informant and given that Javier is supposed to be a participant in the crime of April 21st, the fact that he's been in state prison means, A, he's obviously not a participant in a crime, and B, the home of his parents is not a proper place to be searching. Remember, there's no evidence that 63-year-old Javier, Sr., the retired farm worker, or that his wife, or that the 8-year-old granddaughter had any involvement in any criminal activity whatsoever at any time whatsoever. I mean, unless there's basically kind of a doctrine of blood libel here, well, you have a relative who's a gang member. Therefore, we can search your home. But this was his last known address, wasn't it? No, that was also a disputed fact. The Tenori says DMV records show that this is his address. Well, it turns out that Javier, and again, this is a disputed issue, but Javier, Jr.'s driver's license, he didn't have a valid license. It had been suspended sometime before. We never got the DMV records that they relied on, in other words, how current was it, how stale, et cetera. It was just this bare-bone statement that, well, DMV records show that this is his address. So do you have any speculation as to where Tenori got the address? Well, it was known that this was his residence at some point. I mean, he's 35, 36 years old. Javier, Sr. and his wife have owned the home for many years, and he has lived there. So it's not that he's never been there. The question is, what is his current address? How reliable is the information you have? Is it stale? And there was no showing as to the currency of the information that they were relying on to claim it was their address or that it was Javier, Jr.'s address. And then, of course, you had the fact that, as some of the other officers admitted, gosh, it says in his rack sheet he's been sentenced to state prison. That's something that you should read. And this officer didn't. Or if he did, he says, I ignore it because it's not important. You know, the defendants take the position, this was the position taken by the district judge, too, that, you know, in the end, this doesn't really matter whether Javier, Jr. is there or not because this is an evidence search. So it doesn't really matter. Well, if it's an evidence search, why are you breaking in at nighttime using a SWAT team when all you're looking for is evidence? This gets back to the first point I made, which is you have to start with the nature and the quality of this intrusion when you're weighing a governmental interest. And searching for evidence is a different interest than entering a structure where you expect to find somebody who's dangerous who could present harm. And when you're using this type of entry method, you had better be more careful. That's what the Tenth Circuit said in its Holland decision. That's what District Judge Marbley said in Solis v. City of Columbus. And that's the point that this appeal raises. With this type of dynamic entry, is the government obligated to exercise more care to justify it? Do you want to save two minutes for Roberto? Yes. Thank you, Your Honor. May the Court please? My name is Richard Terzian. I'm appearing for the City of Santa Maria. Could you pull the microphone a little closer to you and speak right up so we can hear you? Is this better? That's much better. Thank you. This entire incident arose from a shooting in the middle of the night. Fourteen bullets were fired. A young boy was struck and had to be hospitalized. Can we get to the search warrant issue? Very well. This was a very serious matter. All of our cases are very serious matters. But let's get to the search warrant issue if we can. I have a question for you. Yes. Hang on. This was a multiple search warrant event, right? Yes, a gang association warrant. Correct. Yes is only good if it works, okay? So the officers involved were plotting out a search of a number of individual homes, correct? Yes. And their sort of tactical concept was that they had to hit every one of these homes at the same time so the occupants couldn't notify each other of what was going on. Is that correct? Yes. I'm good so far? Yes. Okay. Is it correct that during this process of working up this tactical exercise and these warrants that the officers discovered that a James Franklin was not living in the home that was one of the ones that was going to be searched? I don't believe that was the case. I think they checked to see whether or not he was in custody, and the sheriff's office advised that he was not. Was the home of James Franklin searched? I don't believe it was, Your Honor. Now, my understanding from the record is that during the workup of these warrants, whether he was in custody or not, the officers discovered that James Franklin was not present in his home. Can you tell me if that's correct or not? I don't believe that's correct, Your Honor. Okay. Let's assume that it is. My further understanding is the officers pulled that home from the sequence of homes to be searched, correct? They did, yes. Correct? Yes. Yes. Doesn't that suggest that the presence of Javier Jr. in his home was material to the search? It was material in the sense that he did have a criminal record. He had been in prison in the past. No, no, no, no, no. And if I'm wrong factually, I'll look carefully at the record and correct myself internally. But if I'm correct that during this process, the home of James Franklin was selected out of those to be searched because Mr. Franklin was either in custody or in any event not present in the home, and that one was put aside, doesn't that suggest that the presence of the individuals in the home was material to the search effort? Yes, I believe it was. But the district court found it was immaterial. Yes. How could that possibly be correct? Well, in addition to that, Your Honor, the issue really is whether or not that warrant would have issued even if the magistrate had been informed that Mr. Bravo had been sentenced to prison. Well, that's what we're talking about. And the fact that James Franklin had his home taken out when it was determined that he was not there would suggest that the same thing would have happened here, therefore making it material. In other words, are you conceding that the district judge was wrong when he said it's immaterial whether the appellant was there or not? No, because I believe the district judge found that the warrant would have been issued in any event. Didn't some officers testify or offer declarations that if they had known Javier Jr. was not in the home, they would not have searched it, would not even have sought a warrant? Yes, I believe those are the officers for the Santa Barbara Police Department. Ralston. Was he Santa Barbara or Santa Maria? Ralston. Santa Barbara City. I see. Okay. He did not work for Santa Maria. Okay. If I may proceed, Your Honor. That is certainly one of the primary issues, whether or not it was material. Our position is that the warrant still would have been issued because you have a number of witnesses, the victims in this house, who identified the past problems they'd had with this Tangus gang and how they'd been threatened and how they'd been abused and terrorized over the years. And they identified Bravo along with half a dozen others as members of the gang who lived close by who would be likely to hide weapons or other evidence of the attack in each other's homes. Didn't the officers seeking the warrant rely upon Javier Jr.'s criminal record? In part. Didn't they tell the issuing magistrate about the conviction that resulted in his incarceration? Yes, they did. And doesn't the rap sheet that shows that conviction also show that he's in custody? No. It shows that he'd been sentenced to prison for two years. And as we pointed out in our brief, he had been sentenced to prison for two years in 2005. And nine months later, he was out and having another contact with the Santa Maria police. So there was no way of really knowing if he'd been sentenced to two years. Right there on the rap sheet, and they say, Judge, this guy has an extensive record, and here's part of it. And they're looking at it, and they tell him about the fact of the conviction, but they don't tell them that as a result of that conviction, he's been sentenced to prison for two years. They did not disclose to the magistrate of the 2007 sentencing. No question about that. And what conclusion do you draw from that? Is that intentional? Is that reckless? Or is it merely negligence? And I suggest, Your Honor, that it's negligence. He either didn't see it, or he didn't think it was important enough to put in there, because he was likely to have been out. But in any event, certainly not. But there's a level at which that may become recklessness, because certainly, and he noticed that we're not going to be talking about a SWAT team at 5.30 in the morning with a no-knock warrant, right? Right. So it's arguably beyond a mere mistake not to pick that up, at least with regard to the way the warrant was executed. I think at most it was negligence, Your Honor. Aren't we talking about a summary judgment here? Yes. And aren't we to take the inferences in favor of the non-moving party? That's correct, Your Honor. Isn't it a reasonable inference that not disclosing that fact was reckless? No. I believe the only reasonable inference you can draw from that is that it was negligent. Why is that the only reasonable inference? Why can't you draw an inference that the officer didn't think that he wanted to report that? There's no evidence that the officer involved here detected to me. We have no evidence either way about what was in his mind, do we? That's right. There's no evidence. We could draw two inferences. We could draw the inference that he just didn't see it, although he doesn't remember it that way. Or we could draw an inference that he saw it and that he just didn't want to report that. I mean, I don't say that at this stage, summary judgment, we can answer the question. Why isn't it a reasonable inference to draw in favor of the non-moving party? Because there is no evidence to indicate that Detective Tanur did this intentionally. He had nothing in his past that would indicate that he had done this intentionally. To me, it's a little like the Pakistani intelligence people saying that they didn't know Osama bin Laden had been living in a suburb, a Domino's Pizza stop away from the military academy. There's two inferences you could draw from that. One is that they're absolutely correct. They didn't know it. The other inference is that they knew and chose not to take action on it. And that's all Judge Reinhardt is saying. There are two inferences from this. It could have been an entirely legitimate mistake, or it could have been that he didn't want to tell the court this because he knew that if the judge knew that Javier Jr. wasn't present, the warrant wouldn't issue. I'm not saying which one is true, but it's a logical inference, isn't it? Because what you're really saying is that if a jury came back and said, we find this to be reckless, we would have to or the trial judge would have to set that aside because that's just unreasonable as a matter of law. Yes? Yes, that's right, Your Honor. And I just might add that this court in the past, in the Motley case, has indicated that it's not necessary to check out someone's status as to whether or not they're in custody in order to go and search a place and to find out if someone is there. That's the status of the Ninth Circuit law on this subject. And that was the status as of 2006 when all this happened. Well, the Motley case is where you don't need any reason at all to have a peaceful search. You don't have to check that out. You don't need suspicion. You don't need probable cause. You don't need anything because you have a right to search at any time. And they conducted a peaceful search. It's somewhat different from saying, well, you have this type of a search, which requires a lot more than just saying, I'm going to go search. I don't need anything. It's hardly a comparable situation. Essentially, it boils down to this, Your Honor. They did a certain amount. Tenorio did a certain amount to find out if he was in custody. He did what he had done for many years. He checked with the sheriff. And the sheriff said, no, Bravo's not in custody, but Franklin is. So the question is, should he have done more as a matter of law? Did he have to dig further? I suggest to you that is purely a negligence issue, that he should have done more than he actually did. That's a little different also from should he have reported to the magistrate that not only the last item, he was convicted, but he was sentenced to two years. The magistrate can determine what that means. He could also have said, we called Santa Barbara or whatever it is, a sheriff who says he's not in our custody. The magistrate would have had more information. He might have been bright enough to think that people who were sentenced to two years aren't in the sheriff's custody. He's in prison, state prison. The magistrate may not have thought that made a difference. But here the magistrate was deprived of the opportunity to know that he had been sentenced to two years, which might have given the magistrate a different view about whether you're going to tear into a parent's house in the middle of the night and conduct however you want to describe one of those SWAT team raids on people's homes in the middle of the night, where they enter the way they do. They use a stun gun, whatever those things you throw into the room. Flashbangs. Flashbangs. The magistrate might have thought, do I want to have that kind of a raid conducted on his parents' home if he was sentenced to two years? It certainly is something material for the magistrate to consider. Well, Your Honor, that brings me to what is my last argument on this issue, and that is, isn't the real issue here is there are two distinct issues. One is to the issuance of a warrant, and secondly is how the warrant is served. Yes. And there's been a number of cases, and I've described them, Guzman v. Chicago, the Hells Angels v. San Jose case in this circuit, and the Holland X-Rail Oberstdorf in the Fifth Circuit. In all of those cases, the decision to use a SWAT team was considered okay, satisfactory. What was wrong was the way the warrant got executed. But isn't your guy on a traditional tort analysis, if we were talking negligence and he made the mistake, is he not liable for what happens as a result of his mistake that would have been reasonably foreseeable? And given this context, wouldn't it have been reasonably foreseeable that this execution would occur the way it did? Using a negligence tort analysis, yes. But he can't be liable for his negligence. Well, but then if you view it as intentional, you're still going to have the same proximate clause analysis. If they have to prove recklessness or intentional, it's still he who put the ball in motion that led foreseeably to the no-knock and flash grenade entry. Well, yes, he got the warrant, and he got the warrant based upon his good faith belief that Javier Bravo was there. But he certainly didn't instruct and have him. But if he had been asked at the time when he filled out this affidavit, how do you, you know, they're planning on executing this by no-knock and flash grenade, would he have been surprised? I don't know, Your Honor. That's speculation. Well, okay. I have nothing further, Your Honor, unless the Court has added questions. Thank you, counsel. Who's this? He has 45 seconds. Your co-counsel, he's got about 45 seconds. I'd be extremely brief. May it please the Court, Jordan Scheinbaum on behalf of the Appellee County of Santa Barbara. I'm here to talk to you about six facts that I think are most critical to my client's position. My clients didn't secure this warrant. We didn't effectuate entry into the Bravo home. We didn't conduct or participate in it in any way. We didn't determine which houses would be subject to the warrant or to the SWAT entry. We didn't conduct a follow-up search of this warrant in the Bravo household. And we didn't detain the Bravos. My clients never set foot in the Bravo household during the search. And I think perhaps most critically, what we didn't do is we didn't supervise or provide operational control of the execution of the Bravo warrant. This simply, we are the tail of the dog in this case. And we simply weren't there. If I have an opportunity, I'd like to talk to you about Monell and the integral participation doctrines, because those are the only two claims that are against us. I don't know how my colleagues feel about it. Generally, parties on one side have an obligation to confer in advance of argument and divide up the time allotted to their side.  Exactly so. Thank you, Judge. Thank you, Your Honors. Thank you. The Franklin residence was withdrawn because it was determined that Franklin wasn't there. Shifting gears, besides Lieutenant Roston of the Santa Maria Police admitting that, yeah, we messed up, we should have known that Javier, Jr. wasn't there because the house wouldn't have been searched. Santa Maria Detective Laura admitted that as well. That's in the declaration of Tony Olivas that, yeah, we messed up. The claim by Santa Maria that Detective Tenori checked with the Sheriff's Department to see if Javier, Jr. was in custody. Sheriff's Department said, what do you mean? We don't have any record of that. He couldn't say who told him that. And, of course, it made no sense because the Sheriff's Department wouldn't know. That's evidence of the recklessness, I would submit. As well as Detective Tenori's testimony at deposition, when confronted with what the rap sheet shows, said at first, well, I don't recall reading this part about being sentenced to state prison. But then he also said, but gosh, it wouldn't have made any difference whatsoever. From that back-and-forth answer, as well as what he claims to have heard from Santa Barbara Sheriff's Department, one could certainly infer recklessness. Let me ask you this. If the standard was not recklessness or intentional conduct, would you concede that you couldn't get to a jury on intentional conduct? There's no motive here. There's no prior relationship with the guy. No, I would not concede. The reason is, it's an objective, reasonable standard. We expect, we don't look an officer's subjective motivations to say if he did bad or good. An objectively reasonable officer reads his documentation. That's what we'd expect him to do on something like this. He would have read it. An objectively reasonable officer would have reported it to the magistrate so the magistrate could have determined if it was necessary. And, finally, Santa Barbara County did the investigation. They set up the whole operation. Lieutenant Rossler of Santa Barbara County said, we would do this again, the exact same way, have a SWAT team make this entry. And then at the last minute, they handed it off to Santa Barbara City for its SWAT unit. That's why Santa Barbara County is liable. I'm 14 seconds over. Thank you very much. Thank you, counsel. The case just argued will be submitted.
judges: Cogan, Reinhardt, Hawkins